IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JOSEPH L. PIKAS, on behalf of himself and all other persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAMS COMPANIES, INC., and its Benefits Committee and Administrative Committee and Administrator of the Williams Pension Plan, and WILLIAMS PENSION PLAN, <br><br> Defendants. | Case No. 8-cv-101-GKF-PJC |

**OPINION AND ORDER DETERMINING DAMAGES CALCULATIONS**

This matter comes before the court upon plaintiff class's Brief on the Legal Issues Concerning Damages (Doc. #145) and defendants' Motion to Exclude The Declarations of Claude Poulin (Doc. #146).

**I.   Background**

Previously, the court certified a class and defined the starting date of the class period. (Doc. #46 at 43-44). The class includes all lump sum recipients who took their distribution within the three years prior to the filing of the complaint. The court held that Oklahoma's three year limitation for claims based on statutory liability was the most analogous to the class's ERISA-based claim, rejecting the class's argument that Oklahoma's five year limitation for contract-based claims was more analogous. (*Id.*) The court denied the class's motion to reconsider and held that the class representative's claim was timely. Mot. To Reconsider (Doc. #54); Order (Doc. #74).

The parties each filed motions for judgment on liability (Doc. ##111, 113), and the court found defendants Williams Companies Inc. and Williams Pension Plan ("Williams") are liable to the plaintiff class under ERISA, 29 U.S.C. § 1002 *et seq.*:

> Because COLAs are part of the accrued benefit that commences at normal retirement age, ERISA requires any lump sum payment to be actuarially equivalent. The Williams Plan did not provide the actuarial equivalent, and is liable to Pikas and the class. The anti-forfeiture and anti-cutback provisions do not apply because the class did not timely argue that the terms of the Plan itself required a COLA to be paid to lump sum beneficiaries.

*Pikas v. Williams Cos., Inc.*, 2012 WL 5197665, at *8 (N.D. Okla. Oct. 19, 2012) ("Liability Order") (Doc. #123). The court ordered the parties to brief the proper remedy, and held that:

> Under ERISA § 502(a)(3), the Williams Pension Plan is reformed to ensure lump sum recipients receive no less than the actuarial equivalent of the accrued benefit including cost-of-living-adjustments. Plaintiff class is entitled to the difference between what they received and what is required under the reformed Plan. The parties are ordered to complete the damages briefing as outlined above.

("Remedy Order") (Doc. #142 at 6). The parties have agreed on most aspects of the damage calculations, but asked the court to decide the few issues where agreement could not be reached. The court resolves those issues today, and orders the parties to file a joint statement calculating the final damages pursuant to the court's directions by March 4, 2013.

## II. Discussion

### A. Mr. Poulin's Declarations Are Admissible

Plaintiff class proffers Mr. Poulin's three declarations, (Doc. ##145-1, 145-2, and 145-4), in support of its actuarial arguments on damages calculations. Under ERISA regulations, Mr. Poulin was previously an "Enrolled Actuary" who could perform actuarial services. 20 C.F.R. § 901.2(a). But Mr. Poulin's active status as an Enrolled Actuary expired in March 2011 when he did not submit a required renewal application. (Doc. #146-1 ¶7, Ex. B). Nonetheless, Mr. Poulin held himself out to this court as an Enrolled Actuary in his declarations. *See* Doc. #145-2 at 1

("Declaration of Claude Poulin, F.S.A., M.A.A.A., E.A."), *id.* ¶1 ("I am… an Enrolled Actuary under ERISA"), *id.* at Ex A. ("PROFESSIONAL CREDENTIALS: Enrolled Actuary under ERISA"); Doc. #145-2 at 1 ("Declaration of Claude Poulin, F.S.A., M.A.A.A., E.A."), *id.* ¶1 ("I am… an Enrolled Actuary under ERISA"), *id.* at Ex. A ("PROFESSIONAL CREDENTIALS: Enrolled Actuary under ERISA"); Doc. #145-4 at 1 ("Rebuttal Declaration of Claude Poulin, F.S.A., M.A.A.A., E.A."). ERISA regulations prohibit an individual on inactive status from using the term "enrolled actuary" or the designation "E.A."[1]

While Mr. Poulin may be legally unable to "perform pension actuarial services" while on inactive status, he may nonetheless provide testimony and evidence as an expert witness here. *See* Fed. R. Evid. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion"). Defendants do not contest Mr. Poulin's expertise, the reliability of his methodologies, or the application of those methodologies to the facts here. *Id.* Mr. Poulin's contributions are helpful to understanding the issues before the court. His misrepresentation of his qualifications will be considered in weighing his testimony and evidence, but Mr. Poulin's declarations will not be excluded.

---

[1] 20 C.F.R. § 901.11(l)(4)(iv): "An individual in inactive status will be ineligible to perform pension actuarial services as an enrolled actuary under ERISA and the Internal Revenue Code. During such time in inactive status or at any other time an individual is ineligible to perform pension actuarial services as an enrolled actuary, the individual shall not in any manner, directly or indirectly, indicate he or she is so enrolled, or use the term 'enrolled actuary,' the designation 'E.A.,' or other form of reference to eligibility to perform pension actuarial services as an enrolled actuary."

B. **Damage Calculation Issues**

1) Standard of Review

Legal issues are reviewed *de novo*.

The court reviews a plan administrator's interpretations of the plan itself as an appellate court "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to… construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The Williams Plan grants such authority to the Administrative Committee, ensuring deferential review of Plan interpretations. 2002 Plan, art. X, § 10.4(b) (AR 960) (Doc. #119-6 at 152) ("All interpretations of this Plan, and questions concerning its administration and application, shall be determined by the Administrative Committee in its sole discretion and such determination shall be binding on all persons for all purposes."); *see also Owens v. Prudential Ins. Co. of Am.*, 2009 WL 279108, at *5 (N.D. Okla. Feb. 3, 2009) ("the court in this case has conducted its review of the record functioning as an appellate court rather than applying the summary judgment procedure"). Therefore, the Administrative Committee's interpretations of the Pension Plan are reviewed for abuse of discretion.

If the plan administrator is operating under a conflict of interest, the court maintains its arbitrary and capricious standard of review, but must weigh the conflict of interest as a factor in determining whether the decision of the plan administrator was arbitrary and capricious. *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 111–12 (2008). Because the Williams Plan is administered by Williams employees, the court considers this conflict of interest as a factor in reaching its decision. *See Hancock v. Metro. Life Ins. Co.,* 590 F.3d 1141, 1155 (10th Cir. 2009). "[A]s the first step towards 'interpreting an ERISA plan,' we scrutinize the 'plan documents as a whole and, if unambiguous, construe them as a matter of law.'" *Weber v. G.E. Group Life Assur. Co.,* 541 F.3d 1002, 1011 (10th Cir. 2008) (quoting *Miller v. Monumental Life Ins. Co.,* 502 F.3d

1245, 1250 (10th Cir. 2007)). In interpreting plan terms, we "consider the common and ordinary meaning as a reasonable person in the position of the plan participant, not the actual participant, would have understood the words to mean." *Id.* (quoting *Admin. Comm. of Wal–Mart Assoc. Health and Welfare Plan v. Willard,* 393 F.3d 1119, 1123 (10th Cir. 2004)). If the language of the plan is ambiguous, then the court "must take a hard look and determine" whether the plan administrator's interpretation was "arbitrary in light of its conflict of interest." *Id.* (citing *Fought v. UNUM Life Ins. Co. of America,* 379 F.3d 997, 1008 (2004)).

    2)  <u>The COLA Does Not Compound</u>

The parties disagree whether the COLA should be compound or simple. The Plan's plain language disallows compounding as a matter of law. *See Weber*, 541 F.3d at 1011 ("we scrutinize the plan documents as a whole and, if unambiguous, construe them as a matter of law"). The parties agree that the Plan calculates the COLA by multiplying the "Initial Benefit Amount" by a COLA factor. *See* Pl.'s Br. (Doc. #145) at 20 ("the cost-of-living adjustment is computed by multiplying the retiree's 'Initial Benefit Amount' by the applicable COLA Factor"); Defs.' Br. (Doc. #147) at 11 n.12 (same).[2] The language at issue reads:

---

[2] Plaintiff class's reply brief challenges this apparent agreement by reframing the question as "not when the Initial Benefit Amount is fixed, but whether the COLA should be calculated solely upon the Initial Benefit Amount or upon the monthly payments as later increased by previously awarded COLAs." Pl.'s Reply (Doc. #149) at 2. Plaintiff class did not make this argument in its original brief, and in fact, discussed the applicable definition of Initial Benefit Amount for two pages without even suggesting such an argument. *See* Pl.'s Br. at 20-21. Defendants seemingly relied on the apparent agreement about the terms at issue, and thus have not had an opportunity to respond to this newly-raised argument in Plaintiff class's reply brief. "This court will strike new arguments that appear in the reply briefs to avoid a situation where an "opposing party has not had an opportunity to address the issues." *Julie White v. The Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc.*, 2008 WL 191422 (D. Kan. Jan. 22, 2008) (internal quotations omitted). The argument that the Initial Benefit Amount is not the relevant variable to use as the base in the calculation of the COLA is stricken.

> "Initial Benefit Amount" means, in general, the monthly amount initially payable as Pension or Disability Benefit as of the date payment thereof commenced without regard to any adjustment made pursuant to this Section 6.9.... In all cases, the Initial Benefit Amount is fixed at the date the Pension commences to be paid and is unaffected by any adjustment made pursuant to this Section 6.9.

(AR1081-1082) (Doc. #119-7 at 93-94). For the COLA to compound, the Initial Benefit Amount would have to be adjusted each time a COLA was applied, but the Plan language unambiguously defines the Initial Benefit Amount as "fixed" and does not permit such adjustments.

Plaintiff class argues that the Plan language is ambiguous because the referenced Section 6.9 does not exist. Pl.'s Br. at 20-21. The errant section reference occurred due to Williams's adoption of the Transco Energy Company Plan, which included such a section. *See* Defs.' Br. at 12. Regardless, whether the modifier "unaffected by any adjustment made pursuant to this Section 6.9" is ignored or rendered surplusage, the definition of Initial Benefit Amount remains "fixed at the date the Pension commences to be paid." (AR1081) (Doc. #119-7 at 93).

Even if the language was ambiguous, the Administrative Committee met in December 2012, and interpreted the provision to provide a simple, non-compounding COLA. (Doc. #147-2 at Ex. A, p.4) ("the Administrative Committee interprets the applicable Plan language to apply a simple interest calculation to the COLA benefit"). Because the meeting and its result were self-serving and undertaken by Williams employees during this pending litigation and *after* the court found Williams liable for failing to provide the actuarially equivalent value of the COLAs, the court "must take a hard look and determine" whether the plan administrator's interpretation was "arbitrary in light of its conflict of interest." *Weber*, 541 F.3d at 1011. The court should "'typically consider whether: (1) the decision was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan.'" *Id.* (quoting

*Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007)).

Here, the Administrative Committee's process was reasoned and principled, consistent with prior interpretations, reasonable based on external standards, and not inconsistent with the purposes of the plan. The Committee addressed an issue that had not been raised previously because the Committee wrongly believed it need not provide the actuarial equivalent of the COLAs to lump sum recipients. The Committee met and considered the new issue of whether COLAs are compound or simple.[3]

The Administrative Committee's interpretation is not arbitrary nor capricious, and the Committee did not abuse its discretion. Indeed, current annuitants receive a non-compounding COLA. (Doc. #147-1 ¶10) ("any COLA applicable to any annuity benefit has been consistently applied and administered as a simple, not a compound, COLA."). The Summary Plan Descriptions in effect before and after the merger explained how the non-compounding COLA works in non-technical language. *See* (AR434) (Doc. #119-3 at 25) ("The cost-of-living adjustment for any year is applied only to the initial grandfathered benefit amount payable - no prior adjustments are taken into account."); (AR889) (Doc. #119-6 at 81) (same). Given the Plan language, the past practice, and the Summary Plan Descriptions, the Administrative Committee's interpretation is well within its discretion.

In the damages calculation, the COLA will not compound.

---

[3] Plaintiff class asserts that the Committee did not, however, inform or provide an opportunity for the class's representative to be involved in the decision-making process. *See* Pl.'s Reply at 4. Because of this self-serving process and the fact that the meeting occurred during pending litigation and when the company faced millions in damages, the court's review is less deferential than it would be in other circumstances. *See Weber*, 541 F.3d at 1011.

### 3) The Accrued Benefit Includes COLAs Beginning When The Lump Sum Distribution Occurs

When an employee retires before his or her sixty-fifth birthday, the parties disagree about whether COLAs should commence at a participant's actual retirement age or the "normal retirement age" (i.e. a participant's sixty-fifth birthday). "Any lump sum plan must be actuarially equivalent to the accrued benefit, which includes the COLA here." Liability Order at 7. The accrued benefit is defined in ERISA as "the individual's accrued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23). Thus, the court previously held Williams liable for "failing to provide the actuarial equivalent of the normal retirement benefit." Liability Order at 1. ERISA would only require the lump sum option be actuarially equivalent to the annuity expressed as an annual benefit starting at the normal retirement age: sixty-five. Even if Williams offers other early retirement options, ERISA does not require the lump sum option to be actuarially equivalent to those options, it need only be actuarially equivalent to an annuity "expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23).

However, the Williams Plan itself requires the early retirement lump sum option be actuarially equivalent to the early retirement annuity option. (AR951-52) (Doc. #119-6 at 144-45). And Treasury Regulations mandate that:

> a plan that provides a subsidized early retirement annuity benefit may specify that the optional single sum distribution form of benefit available at early retirement age is the present value of the subsidized early retirement annuity benefit. In this case, the subsidized early retirement annuity benefit must be used to apply the valuation requirements of this section and the resulting amount of the single sum distribution.

26 C.F.R. § 1.411(a)–11(a)(2). Thus, the lump sum option for early retirees is required by law to be actuarially equivalent to the early retirement annuity. Because the early retirement annuity

includes a COLA that commences the year following retirement (not at age sixty-five), (AR1080-81) (Doc. #119-7 at 92-93), the lump sum option for early retirees must include the actuarial equivalent value of those COLAs as well as the COLAs after the normal retirement age.

For damages calculations, the COLAs commence the year after the member receives his or her lump sum distribution.

### 4) The COLA Factor Will Be Calculated Separately For Each Class Member

The proper COLA factor is an issue of law and determined *de novo*. Both parties submitted helpful expert material to support their proposed COLA factors. Plaintiff class requests 3%; defendants suggest 1.6%. Pl.'s Br at 23; Defs.' Br. at 20. An understanding of the Williams Plan's unique COLA calculation is necessary to determining the appropriate COLA factor for each class member.

The COLA each year is determined in part by multiplying the Initial Benefit Amount by the COLA factor. The Plan annuitants receive either a 0% or 3% COLA factor each March 1. If the Consumer Price Index (CPI) increased 3% between the immediate past December and the previous December, annuitants receive a 3% COLA factor. Any CPI increase above 3% is rolled over to the next year's calculation. If the CPI increase is below 3%, the Plan annuitants receive a 0% COLA factor and the CPI change is rolled over to the next year's calculation. For example, a recipient in 2012 receives $1,000/month. If the CPI increase from December 2011 to December 2012 is 4%, then the recipient will receive $1,030/month beginning March 1, 2013 – applying a 3% COLA factor. The remaining 1% increase will be rolled over. Then, if the CPI increase from December 2012 to December 2013 is 2.5%, the recipient will receive $1,060/month beginning March 1, 2014 – applying a 3% COLA factor – because the rolled over 1% and the 2.5% CPI change combined exceed 3%. The remaining 0.5% would be rolled over. Finally, if the CPI increase from December 2013 to December 2014 is 2%, the recipient will receive $1,060/month

before and after March 1, 2015 – applying a 0% COLA factor – because the combined rollover (0.5%) and the CPI increase (2%) do not exceed 3%. Therefore, a 3% COLA factor each year is the maximum an annuitant could theoretically receive.

To calculate the actuarial equivalent of the COLAs received by annuitants, the Plan must *forecast* what the COLA factor will be in future years (similar to forecasting the life expectancy of the lump sum beneficiary). This projection must be made based on information available at the time the distribution is made. *See* Pushaw Report (Doc. #145-3) at 10; Poulin Rebuttal Decl. (Doc. #145-4) ¶6. While the IRS provides detailed guidance on forecasting life expectancy, it only directs plans to "specify a reasonable basis for determining the value" of a COLA. *See* Pushaw Report at 10, Ex. 8. Any reasonable basis will be between 0% and 3% per year as those are the minimum and maximum possible COLAs for annuitants.

Given the Plan's unique 3% minmax formula, the court will follow these steps to establish an appropriate COLA factor: First, establish the date on which the forecasts should be made. The court must determine what the forecasted CPI increases would have been when the lump sums were taken; Second, determine the appropriate CPI forecast method and thus the average expected CPI increase; Third, translate that CPI increase into a COLA factor that reflects the effect of variance in future CPI increases under the 3% minmax formula.

    a)  *Forecast Date: Date of Lump Sum Distribution*

The court does not consider information not available to the plan administrator at the time the CPI increases should have been forecasted. Plaintiff class suggests that the court should use 2002 as the forecast date because Pikas received his lump sum payment in 2002. Because the plaintiff class members received their payments at different times – and all others were later than 2002 – this date is not ideal. Defendants provide no specific option for a forecast date. The court will require the plan administrator to forecast CPI increases at the time the recipient received

their lump sum. For Pikas, that will be 2002. Other class members received their lump sum distribution in later years. *Cf. Laurenzano v. Blue Cross & Blue Shield of Mass., Inc. Ret. Income Trust*, 191 F. Supp. 2d 223, 238 (D. Mass. 2002) (describing projected average annual COLAs based on the year of distribution). The court next considers how the plan administrator must forecast CPI increases.

### b) *Forecasting CPI Increases: The Philadelphia Federal Reserve Bank Survey of Professional Forecasters' 10-Year CPI Inflation Rate*

The parties' experts provide various methods for projecting CPI increases. Plaintiff class argues for a 3% annual COLA factor. Plaintiff class bases that factor on the fact that historical averages of CPI changes over the 15, 20, 25, or 30 years prior to 2002 were all greater than 3%. Pl.'s Reply at 8; Pl.'s Br. at 17-18. Similarly, the 2002 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Disability Insurance Trust Funds ("Social Security Trustees") projected COLA benefits to average 2.9% from 2002-2011. Pl.'s Br. at 18. And, in 1996, the Transco Plan's Actuary assumed that cost of living would increase at 4% a year when considering the funding needed to sustain the Plan. *Id.*

Defendants' expert provides average expected inflation forecasts from professional forecasters published by the Philadelphia Federal Reserve Bank in 2012 about the years 2012-2021. Pushaw Report at 13. The median expected inflation is 2.3% and the average is 2.34%. *Id.* Defendants' expert also provides the Blue Chip Financial Forecasts survey of economists from 2012 about the years 2013-2023. The "consensus forecast" for that decade as of December 2012 is 2.37%. Perhaps recognizing that forecasts should be calculated from the lump sum distribution year, not 2012, defendants' expert notes the Philadelphia Federal Reserve Bank survey in 2004 found a median 2.5% and a mean 2.5% forecasted inflation over the next decade. And he notes the Blue Chip forecast in 2004 over the ensuing decade was 2.61%. Because the forecasts must

be made based on data available in the year of the lump sum distribution for each recipient, the data provided – covering only 2002, 2004 or 2012 – is insufficient for the court to provide specific CPI forecasts for all class members.

After reviewing the various methodologies used by the parties' experts, the court orders the plan administrators to apply the Philadelphia Federal Reserve Bank professional forecasters' median forecast for the 10-Year CPI Inflation Rate from the quarter that the participant received his or her lump sum distribution. *Available at* http://www.philadelphiafed.org/research-and-data/real-time-center/survey-of-professional-forecasters/data-files/CPI10/. For example, Pikas received his lump sum distribution in 2002 Q4. The projected CPI increase for Pikas would be 2.45%. This measurement properly elevates the expectations at the time of the distribution over backward-looking averages or after-the-fact review of the actual CPI changes. The professional forecasters no doubt included past experiences in their forecasts, but also incorporated economic and policy changes – including the Federal Reserve's record of taming inflation since the early 1980s – into their projections. The independent nature of using a third-party forecast and the use of a median forecast eliminate the possibility that Williams could cherry-pick favorable numbers to ensure artificially low COLA projections.

        c) *Translating CPI Increases Into a COLA Factor: Adopting Mr. Pushaw's Stochastic Model and Conversion Factor*

Defendants urge that because of the 3% minmax formula, the projected average CPI increase need be reduced to account for the effect of variance. Put otherwise, if the projected average CPI increase is 1.5% based on the measurement identified in the previous section of this opinion, that does not mean inflation will be 1.5% each year in the future. Defendants adequately illustrate the effect of inflation variance in their brief and suggest a stochastic model to translate

a stable CPI increase into an equivalent COLA factor. Defs.' Br. at 24-26; Pushaw Report at 14-17.[4]

The court adopts this methodology because a simple average artificially eliminates variance and recipients receiving annuities cannot eliminate that variance.[5] Based on Mr. Pushaw's stochastic model, the forecasted average future inflation need be converted by multiplying the forecasted average CPI increase by 0.845. Pushaw Report at 16. This conversion ensures equivalence between the annuitants who face variance-based risk and lump sum recipients who do not. For Pikas, who faces a forecasted CPI increase of 2.45%, *see supra* § II.B.4)b), the COLA factor will be 2.07% (2.45% times 0.845).[6]

---

[4] For similar reasons, plaintiff class's suggestion of a 3% increase every year would over-compensate lump sum recipients. A guaranteed 3% increase every year protects lump sum recipients from the risk that annuitants face if CPI increases do not cumulatively total 3% every year. Even if the forecasted average CPI increase were 3%, annuitants would not likely receive a 3% increase every year. A simple example would be if the first year CPI increase was 2%, and the second year 4%. Under the 3% minmax methodology, the annuitant would receive a 0% COLA factor the first year and a 3% COLA factor the second. Applying the 3% average each year would provide a 3% COLA factor each year. Given the Plan's 3% annual maximum, the annuitants could never make up the difference in future years. Thus, guaranteeing lump sum recipients receive 3% every year would remove the risk annuitants face and would not be actuarially equivalent, even if the average CPI increase were 3%.

[5] Plaintiff class's expert, Mr. Poulin, raises reasonable concerns about the inputs used in Mr. Pushaw's stochastic model, *see* Poulin Rebuttal Decl. ¶¶34-45, but neither Mr. Poulin nor plaintiff class provide an argument against converting a forecasted CPI increase into a lower COLA factor to account for the effect of variance. Therefore, the court does not adopt Mr. Pushaw's input choice of CPI increases between 2.0-2.5%, but does adopt the need to convert the constant, average CPI increase to a lower COLA factor.

[6] Defendants' expert raises two legal concerns in his expert report that defendants do not mention in their briefing. Specifically, defendants' expert mentions that a 3% COLA factor every year could violate "IRC sections 401(a) and theoretically, 415, which would expose the entire Plan to potential disqualification." Pushaw Report at 7. The court need not go into the details of these portions of the Internal Revenue Code. However, if those thresholds are implicated, the court agrees with plaintiff class's expert that the proper way to address them "is not to adjust a plan's COLA factor but rather to limit the benefit in the final lump sum calculation to the… limits in effect at the time of distribution." Poulin Rebuttal Decl. ¶23.

d) *Summary of COLA Factor Holdings*

The court holds the COLA factor is to be determined for each individual class member based on the lump sum distribution date. For each class member, the Philadelphia Federal Reserve Bank professional forecasters' median forecast for the 10-Year CPI Inflation Rate from the quarter that the participant received his or her lump sum distribution shall be the expected inflation rate. That rate shall be converted by the 0.845 conversion factor based on Mr. Pushaw's stochastic model to calculate the class member-specific COLA factor. For Pikas, the expected inflation rate from 2002 Q4 is 2.45%. And the converted COLA factor is 2.07%.

5) <u>Pension Benefit Guaranty Corporation Rate and Early Retirement Benefits</u>

Lump sum values were calculated using the Pension Benefit Guaranty Corporation discount rate and included certain early retirement benefits in the calculation. Plaintiff class argues that the recalculated lump sum values including COLAs must use the same discount rate and include the same early retirement benefits as the original lump sum values. Pl.'s Br. at 25-27. Defendants now agree,[7] but request the court consider "these and other instance of TWC's voluntary (that is, not required by ERISA) and very substantial generosity in other aspects of Plaintiffs' Plan benefits when considering whether the equities in this case support an award of any prejudgment interest." Defs.' Br. at 26-27. Therefore, the PBGC discount rate and early retirement benefits included in the original lump sum values must be used and included in the recalculated lump sum calculation.

---

[7] Defendants previously signaled an intent to argue for a different discount rate and to assert that the Plan's provision for early retirement benefits not required by ERISA should reduce the company's liability. *See* Pl.'s Reply at 11 n.81 (citing Tr. of Proceedings on Nov. 2, 2012 (Doc. #132) at 13; Tr. of Proceedings on Feb. 29, 2012 (Doc. #105) at 34). Defendants now concede both points, but request equitable credit for providing more than ERISA requires.

6) The Court Awards Prejudgment Interest At A Rate of 3.95%

Plaintiff class asserts three justifications for an award of prejudgment interest: (1) disgorgement of the unlawfully withheld assets, *see Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1008 (8th Cir. 2004); (2) compensation for the loss of use of the money from the date the lump sum was received until the judgment date, *see Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1286 (10th Cir. 2002); and (3) pursuant to a state statute governing bad faith insurers, *see Weber*, 541 F.3d at 1017 (citing 36 O.S. § 3629(B)). Defendants argue that the savings they obtained by not providing COLAs when adopting the Transco Plan permitted Williams to generously provide benefits beyond the ERISA-mandated minimum, and those benefits should be considered when evaluating the equities that underlie an award of prejudgment interest. Defs.' Br. at 27-32. The Tenth Circuit provides some guidance concerning prejudgment interest in ERISA cases:

> The award of prejudgment interest is considered proper in ERISA cases. Prejudgment interest is appropriate when its award serves to compensate the injured party and its award is otherwise equitable…
>
> We have held squarely that punitive damages are not available in an ERISA action. Although prejudgment interest is typically not punitive, an excessive prejudgment interest rate would overcompensate an ERISA plaintiff, thereby transforming the award of prejudgment interest from a compensatory damage award to a punitive one.

*Allison v. Bank One-Denver*, 289 F.3d 1223, 1243 (10th Cir. 2002). And the proper "rate for prejudgment interest also rests firmly within the sound discretion of the trial court." *Weber*, 541 F.3d at 1016.

First, the court embraces the ultimate objective of "compensat[ing] the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of the judgment." *Caldwell*, 287 F.3d at 1286. Thus, the question becomes what constitutes the time of loss and what rate is appropriate. Because plaintiff class members were entitled to the funds at

- 15 -

the time of their lump sum distribution, prejudgment interest will run from the date they received their lump sum distribution. *See id.* at 1287 (award of prejudgment interest appropriate from the date the benefits were due).

Second, the court rejects using the Oklahoma statutory rate for bad faith insurance claims. While the Tenth Circuit affirmed this court's prior use of the 15% statutory rate, that case involved a company that arbitrarily and capriciously denied an employee's rightful claim to a company "Voluntary Life Insurance" policy. *Weber*, 541 F.3d 1002. Here, the miscalculated lump sum benefit did not involve denying an insurance claim, and a 15% rate would overcompensate plaintiff class members and punish the defendants.

Third, to properly compensate for loss of use, the court awards a prejudgment interest rate of 3.95% - the Treasury constant maturities nominal 7-year rate on May 13, 2005. *Available at* http://www.federalreserve.gov/releases/h15/20050516/. The May 13, 2005 date is chosen because that date is the midpoint of the three year class window – all class members other than Pikas received their distributions on various dates from November 15, 2003 through November 14, 2006 – and to reduce the logistical workload of identifying a different rate for each member. The Treasury constant maturities nominal 7-year rate is chosen to most closely approximate the risk-free opportunity cost of possessing the funds from the lump sum distribution dates until the judgment date.

Finally, the court has considered that Williams's ability to provide extra benefits to these lump sum recipients is due in part to its withholding the actuarial equivalent of COLAs to them, but the court finds no justification for adjusting the prejudgment interest rate. To lower the rate would render the compensatory nature of the prejudgment interest award incomplete. The extra

benefits that Williams offered were obtained by those who took annuities as well, and recipients who opted for the lump sum option should not be put in a worse position due to their decision.

Prejudgment interest is awarded for each member from the lump sum distribution date to the judgment date at 3.95%.

WHEREFORE, defendants' Motion to Exclude The Declarations of Claude Poulin (Doc #146) is denied. The contested damages calculation issues are resolved as follows:

- The COLA is non-compounding.

- The COLAs take effect the year after the lump sum distribution occurred, not at age sixty-five.

- The COLA factor shall be calculated for each class member as: the Philadelphia Federal Reserve Bank professional forecasters' median forecast for the 10-Year CPI Inflation Rate from the quarter the participant received his or her lump sum, converted by a 0.845 conversion factor to account for the effect of variance within the Plan's 3% minmax methodology.

- The PBGC discount rate and early retirement benefits included in the original lump sum values must be used and included in the recalculated lump sum calculation.

- Prejudgment interest is awarded for each member from the lump sum distribution date to the judgment date at 3.95%

The court orders the parties to file a joint statement calculating the final damages pursuant to the court's directions by March 4, 2013 so judgment may be entered. And defendants' Application For Oral Argument On Pending Issues Concerning Damages (Doc. #150) is denied as moot.

DATED this 20th day of February, 2013.

*[signature]*
GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT